IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | |
|---|---|
| CLYDE and TERESA DRIVER, ) | |
| ) | |
| Plaintiffs; ) | |
| ) | |
| vs. ) | |
| ) | |
| W.E. PEGUES, INC., and ) | |
| SAMMY LANSDELL; ) | |
| ) | 7:11-cv-1374 LSC |
| Defendants/ ) | |
| Third-Party Plaintiffs; ) | |
| ) | |
| vs. ) | |
| ) | |
| KIMBERLY NEAL LEE and ) | |
| BECKEY NEAL; ) | |
| ) | |
| Third-Party Defendants. ) | |

MEMORANDUM OF OPINION

**I. Introduction**

The Court has before it Defendants' motion for summary judgment, seeking the dismissal of all claims remaining in this action. (Doc. 59.) In their complaint, Clyde and Teresa Driver ("the Drivers") originally asserted five claims for relief: wanton interference with a grave, negligent interference with a grave, intentional or reckless infliction of emotional distress (outrage), negligent supervision, and civil conspiracy.

This Court previously dismissed the Drivers' claims for wanton interference with a grave, negligent interference with a grave, and all counts against Robert and William Pegues. (Doc. 20.) Still at issue are claims against W.E. Pegues, Inc. and Sammy Lansdell for intentional or reckless infliction of emotional distress (outrage), negligent supervision, and civil conspiracy. (*Id.*)

Defendants contend that the remaining claims are barred under the doctrine of res judicata because a "virtually identical" lawsuit was filed by the Drivers' son, Britt Godsey, in the Circuit Court of Lamar County, Alabama in December of 2009, in which the Drivers were "substantially involved." Defendants also maintain that the Drivers lack standing to bring a claim of outrage; and, in the alternative, that Defendants' actions do not amount to outrageous conduct. Further, Defendants assert that there is no evidence showing that Sammy Lansdell was an incompetent employee, or that his employer, W.E. Pegues, Inc., was aware of his alleged incompetency. Finally, Defendants insist that there is no evidence to support a claim of civil conspiracy. The issues raised in Defendant's motion have been fully briefed and are ripe for decision. After careful consideration of all of the arguments and evidence presented,[1] Defendants' motion is due to be granted in part and denied in part.

---

[1] In addition to the summary-judgment motion itself, the Court has for consideration two separate motions related to the evidence presented. The first is Plaintiffs' motion to strike some of Defendants' evidence offered in support of summary judgment. (Doc. 71.) Although the Court limits its consideration to admissible evidence, the motion as presented is DENIED. The second motion is Defendants' request for leave to file additional materials—attached to the request—in support of its summary-judgment arguments. The Court GRANTS this motion, although the attached materials do not ultimately affect the Court's decision.

## II. Facts[2]

Dillon Godsey lived less than three months. Dillon was buried in Webb Cemetery in Lamar County, Alabama, following his death in 2008. Soon thereafter, his parents, Britt Godsey and Kimberly Neal, divorced. Neal moved to Mississippi near her mother—Dillon's maternal grandmother—Becky Neal.

Sometime during 2009, Becky or Kimberly Neal approached the Defendants about moving Dillon's body to Mississippi. W.E. Pegues, Inc. ("Pegues") is an entity that operates a funeral home in Tupelo, Mississippi, and employed Sammy Lansdell ("Lansdell"). Pegues suggested that the Neals should instead use the funeral home in Lamar County, Alabama, that had handled the original burial. But the Neals told Pegues that the Drivers, Dillon Godsey's paternal grandparents, had a friendly relationship with that Lamar County funeral home. The Neals and Drivers did not get along. Indeed, the Neals told Pegues that Clyde Driver would shoot them.

Pegues agreed to disinter Dillon's body and move it to Mississippi. Pegues did not, however, inform the Drivers of the planned disinterment. In November 2009, Pegues filed a Funeral Director's Request with the Lamar County Health Department to disinter Dillon but did not obtain a court order or consent from Britt Godsey, the

---

[2]The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the Court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

father of Dillon Godsey. Pegues' workers then proceeded to the location of Dillon's grave in Lamar County, Alabama.

That same day, the Drivers were driving near the Webb Cemetery when they noticed a Chevrolet Suburban and a backhoe parked near Dillon's grave. They approached, discovering Lansdell digging up Dillon's casket. When confronted by the Drivers, Lansdell told them that he had a court order. The Drivers demanded to see the order, but Lansdell did not produce it. Instead, he jumped in the Suburban with Dillon's casket inside it and fled the scene at high speed, slinging gravel. The Drivers were unable to catch him.

Defendants then attempted to hide Dillon's body from the Drivers. First, they planned to disinter Becky Neal's husband and bury Dillon underneath him in Europa, Mississippi, but Becky Neal feared the Drivers might discover that plan. Dillon was instead buried in a mausoleum near Tupelo, Mississippi, a place with surveillance cameras to prevent Dillon's removal.

Dillon's father, Britt Godsey, brought suit and settled his claims against Defendants. The Drivers filed this action in April of 2011.

## III. Standard of Review

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled

to a judgment as a matter of law." FED. R. CIV. P. 56(c). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the evidence] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. In evaluating the arguments of the movant, the court must view the evidence in the light most favorable to the nonmoving party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting FED. R. CIV. P. 56(e)). "A factual dispute is genuine only if a 'reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

## IV. Discussion

### A. Res Judicata

The elements of res judicata, or claim preclusion, are "(1) a prior judgment on the merits, (2) rendered by a court of competent jurisdiction, (3) with substantial identity of the parties, and (4) with the same cause of action presented in both suits. If those four elements are present, any claim that was or could have been adjudicated in the prior action is barred from further litigation." *Dairyland Ins. Co. v. Moore*, 566 So. 2d 723, 725 (Ala. 1990) (internal citation omitted). Defendants claim that the remaining three counts are barred by res judicata.

Defendants argue that the substantial identity of the parties is derived from the fact that Britt Godsey virtually represented the Drivers in his suit against the same Defendants. Defendants refer the Court to *Rhodes Mut. Life Ins. Co. v. Moore*, 586 So. 2d 866 (Ala. 1991), as an example of when the facts would warrant a legal determination of virtual representation. However, in *Rhodes,* virtual representation was based on the fact that the next of kin, who was not a party in the suit, "made a conscious decision to allow his brother and his son to prosecute [the] action on his behalf." *Rhodes* at 871. Nowhere in the record is there any indication that Plaintiffs made a conscious decision to be represented by their son, Britt Godsey, in his previous suit.[3] More importantly, perhaps, the Drivers' claims are rooted in the damages they

---

[3] Defendants attempt—unsuccessfully—to show otherwise in their late-filed materials in support of summary judgment. Although Defendants point out that some of Britt Godsey's settlement "inured to the

sustained as a result of actually witnessing their grandson being exhumed, as well as the turmoil that followed. The damages sought in the Drivers' claim for outrage are not directed at the desecration of Dillon's grave *as such*, but their firsthand experience of it. *See Hogan v. Woodward Iron Co.*, 83 So. 2d 248 (Ala. 1955). Britt Godsey did not seek or recover the damages now claimed by the Drivers—nor could he have—and therefore did not virtually represent Clyde and Teresa Driver in his earlier suit against the Defendants.

Defendants also contend that the Drivers were in actual privity with the Defendants because Mrs. Driver held a power of attorney for Britt Godsey. But Defendants offer no authority supporting a determination of privity through a power of attorney. Powers of attorney are given strict construction, and restricted to those powers expressly granted. *Hall v. Cosby*, 258 So. 2d 897 (Ala. 1972). "When one accepts the agency, she implicitly covenants to use the powers conferred upon her for the sole benefit of the party conferring such power, consistent with the purposes of the agency relationship." *Sevigny v. New South Federal Sav. and Loan Ass'n.*, 586 So. 2d 884, 886 (Ala. 1991.) Even if a power of attorney could establish privity, it would not

---

benefit of the Drivers," the money they received was only a small fraction of Godsey's settlement. Moreover, it only reached the Drivers after being given to them by an intermediary, and without any indication that Godsey was aware that the gift would be made. (Doc. 82 at 3.)

    Defendants also claim that the Drivers' presence at the courthouse on the day of Godsey's trial was a "tactical maneuver," demonstrating that the Drivers were "more than a 'laboring oar'" in the litigation. (*Id.* at 6.) But Defendants are doubtless aware—as their own motion acknowledges—that the Drivers were witnesses in that case, and on the day of trial "were on standby, basically, in case [they] needed to be called." (*Id.* at 3–4.) The Court cannot reasonably infer from either of these circumstances that the Drivers were controlling Godsey's case, or so involved as to properly invoke res judicata.

do so here. The power of attorney given to Teresa Driver made her an agent of Britt Godsey, and not the other way around. Nowhere is it indicated that Britt Godsey had any authority, through that power of attorney or otherwise, to act as his mother's agent. Even if Teresa Driver had the authority to bring the prior suit on behalf of her son, Britt Godsey did not have any authority to bring suit on behalf of his mother.

In order for the Drivers' claims to be barred by res judicata, all four elements must be present. *Dairyland*, 566 So. 2d at 725. Because Defendants have failed to show that the parties are substantially the same, their res judicata argument fails.

**B. Drivers' Standing**

Defendants claim that the Drivers lack standing to bring a claim for injuries related to the desecration of their grandchild's grave. They are correct that normally it is only the surviving spouse or next of kin that is the proper party to recover damages for mental suffering as a result of injury to a burial plot. *See Hogan*, 83 So. 2d 248. As the Alabama Supreme Court has recognized, in such circumstances "it is inconceivable that each member of the family could maintain a separate action to recover for mental pain and anguish." *Id*. at 249. However, while interference with the burial site may be the mechanism of the Drivers' injuries, the damage to the grave and the outrageous and offending nature of it to the child's heirs and next of kin in general is not the damage upon which they base their claim of outrage. Instead, it is the Drivers' individual damage, injury, and distress actually experienced firsthand:

witnessing their grandchild being exhumed without notice, Lansdell claiming to have a court order but refusing to present it, Lansdell refusing to tell Plaintiffs where the body was being taken, and Lansdell speeding away from the grave. The Drivers experienced actual and unique injury, and thus have standing to sue for those injuries.

Alabama law recognizes outrage in the context of family burials for more than just the next of kin. *See Whitt v. Hulsey*, 519 So. 2d 901, 906 (Ala. 1987) (finding outrage in "the desecration and destruction of a portion of a family burial ground" without inquiring into whether the multiple plaintiffs were next of kin). Defendants cite *Payne v. Alabama Cemetery Assoc.*, 413 So. 2d 1067, 1071 (Ala. 1982), as stating that any tort action "related to unwarranted interference with a buried body" is properly brought by the nearest present relative. However, the claim at issue in *Payne* in was "grounded upon the legal right vested in the next of kin to maintain an *action for unwarranted interference with a buried body*." *Payne* at 1071 (emphasis added). An action for unwarranted interference with a buried body is distinct from an action for outrage *related to* that same interference. The scope of the former is necessarily restricted to next of kin, while the scope of the latter need not be, since it is naturally limited to those who personally experience the outrageous conduct. Alabama has recognized that "intentional infliction of emotional distress by extreme and outrageous conduct constitutes a cause of action in itself, apart from any traditional tort." *American Road Service Co. v. Inmon*, 394 So. 2d 361, 364 (Ala. 1981). As

discussed above, the Drivers' claim is not for mental anguish arising merely from unwarranted interference with a buried body itself, but severe emotional distress suffered as a result of outrageous conduct directed *toward the Drivers* at the site of Dillon Godsey's disinterment. Under these circumstances, the Drivers have standing to assert this cause of action.

### C. Outrage Claim

In order to prevail in a claim for the tort of outrage, there must have been intentional or reckless conduct so extreme and outrageous as to cause emotional distress so severe that no reasonable person could be expected to endure it. *Thomas v. BSE Indus. Contractors, Inc.*, 624 So. 2d 1041 (Ala.1993). The cause of action for outrage in Alabama is limited, but is allowed in cases involving "wrongful conduct in the context of family burials." *Horne v. TGM Associates, L.P.*, 56 So. 3d 615, 631 (Ala. 2010). "For an outrageous conduct count to be properly submitted to a jury, there must be sufficient evidence from which permissible inferences could be drawn to support a finding of extreme conduct necessary to constitute outrageous conduct." *Whitt*, 519 So. 2d. at 904 (quoting *Impiregas, Inc. v. Geary*, 431 So. 2d 1258, 1261 (Ala. 1983)). In determining what may be outrageous conduct, Alabama has said that "decisions lay much stress on the sacredness of resting ground of the dead" and factor in "deep human feelings involved." *Id.* at 906.

The Drivers are not claiming outrageous conduct from any damage done to the burial site or damage or interference with the body in general. Instead, their mental anguish stems from the behavior of the Defendants that they actually witnessed at the gravesite. According to the Plaintiffs, they witnessed Defendants digging up the grave of their grandson and, upon inquiry to defendant Sammy Lansdell, were told by him that there was a court order to disinter the body. (Doc. 61-13 at 4, Doc. 61-14 at 4.) Plaintiffs then requested to see the court order and that request was not granted. (*Id.*) Plaintiffs then turned to speak to the driver of the backhoe and, while doing so, Landsdell sped off in a white suburban, slinging gravel and carrying away the body of Dillon Godsey. (*Id.*) Plaintiffs chased Defendant at a high rate of speed, but were never able to catch up with him or get close enough to get a license plate number, nor were they ever told where their grandson was being taken. (*Id.*)

A reasonable jury could find that outrageous conduct took place. Because there is a genuine issue of material fact, summary judgment must be denied as to this claim.

**D. Negligent Supervision Claim**

In order to prevail on a claim for negligent supervision, Plaintiff must show that (1) the employee was incompetent, (2) the employer knew or reasonably should have known of the employee's incompetence, (3) the employer failed to exercise reasonable care once on notice of the employee's incompetence, and (4) the employer's

negligence is a legal or proximate cause to Plaintiff's injuries. *Jones Exp., Inc. v. Jackson,* 86 So. 3d 298 (Ala. 2010).

Defendants maintain that there is no evidence to support a showing of Sammy Lansdell's incompetence, and that even if it can be shown that Sammy Lansdell was incompetent, there is no evidence showing that Pegues was aware or should have been aware of the alleged incompetence. (*Id.* at 30.) A review of the record supports the conclusion that there is no evidence that Pegues knew or should have known of Lansdell's incompetence. While there may be evidence that Pegues' agents acted negligently in conducting the disinterment, there is no evidence or allegation that such negligence occurred regarding the supervision of Sammy Lansdell at the time of the incident in question. Greg Pegues testified that he knew Lansdell was in contact with Phelps Dunbar, the law firm hired by the Neals, concerning the disinterment. On the morning of November 9th, the day of the disinterment, Lansdell told Mr. Pegues that Phelps Dunbar had the documents ready to pick up, and that they could go ahead with the disinterment. Mr. Pegues responded by telling Lansdell to make sure he got a court order. Later that afternoon, Landsell called Mr. Pegues and told him that he was still trying to get some of the details worked out. In that same conversation, Lansdell told Mr. Pegues he didn't yet have a court order. Mr. Pegues responded, again, that he must have it in order to do the disinterment. Both Lansdell and Greg Pegues testified that Pegues was not aware that the disinterment had been done without a

court order or that there were any other problems until November 10th, and that Pegues was not aware the body had been dug up at all until Lansdell was in the car with the body on the way back to Mississippi.

Additionally, there is nothing in the record to indicate that Pegues knew or should have known Lansdell would, as the Plaintiffs allege, withhold the location of where their grandson was being taken, speed off from the cemetery slinging gravel, and continue at such high speed that the Plaintiffs would be unable to catch up and get a license plate number. Moreover, nothing on the record indicates any past incompetent acts by Lansdell that should have put Pegues on notice. Thus, the second element of the supervisory tort has not been demonstrated, and analysis of the remaining elements is unnecessary. Summary judgment on the claim for negligent supervision is due to be granted.

### E. Conspiracy Claim

"One should have some means of redress when it is shown that persons have combined and conspired to injure him in his person or property, and have done acts which have produced that effect, unless the defendants show some legal justification." *Snyder v. Faget*, 326 So. 2d 113 (Ala. 1976). Civil conspiracy rests upon the existence of an underlying claim. *Jones v. BP Oil Co., Inc.*, 632 So. 2d 435 (Ala. 1993). If there is no underlying cause of action, there cannot be a conspiracy. *Id.*

The only possibly underlying cause of action here is the Drivers' only surviving claim for outrage. There is no evidence, however, from which a reasonable jury could conclude that Defendants ever made such plans; whatever agreement may have been reached certainly did not include plans to commit the tort of outrage. Summary judgment is therefore due to be granted in Defendants' favor with regard to the conspiracy claim.

## V. Conclusion

For the reasons stated above, genuine issues of material fact are present as to the tort of outrage, but not the remaining claims. The motion for summary judgment is therefore due to be DENIED for both Defendants as to the tort of outrage and GRANTED for both Defendants as to the claims for negligent supervision and conspiracy. A separate order consistent with this opinion will be entered.

Done this <u>19th</u> day of <u>July 2012</u>.

*[signature]*

L. Scott Coogler
United States District Judge

[167037]
